**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**


| | | |
|---|---|---|
| DR. SUSAN KEGERISE, | : | No. 22 MAP 2017 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Commonwealth Court dated September |
| | : | 13, 2016, reconsideration denied |
| v. | : | November 9, 2016, at No. 232 CD 2015 |
| | : | Affirming the Order of the Court of |
| | : | Common Pleas of Dauphin County, Civil |
| KATHY L. DELGRANDE, JOHN F. | : | Division, dated November 5, 2014 at |
| DIETRICH, CLIFTON D. EDWARDS, | : | No. 2014-CV-3793-CV. |
| CAROL L. KARL, JESSE RAWLS, SR., | : | |
| DR. PETER J. SAKOL, HELEN D. | : | ARGUED: November 29, 2017 |
| SPENCE, AND MARK Y. SUSSMAN, IN | : | |
| THEIR OFFICIAL CAPACITIES, | : | |
| | : | |
| Appellants | : | |


**OPINION**


**JUSTICE WECHT**                                        **DECIDED: April 26, 2018**

In this mandamus action involving the law of constructive discharge and Pennsylvania's Public School Code,[1] Dr. Susan Kegerise seeks reinstatement as superintendent of the Susquehanna Township School District, as well as back pay and benefits. Kegerise prevailed in the trial court, and the Commonwealth Court affirmed. For the reasons that follow, we reverse.

---

[1] Act of March 10, 1949, P.L. 30, No. 14, codified as amended, 24 P.S. §§ 1-101, *et seq*.

In January 2010, Kegerise was appointed superintendent of the Susquehanna Township School District. On May 7, 2013, that District's Board of Directors[2] extended Kegerise's contract for a three-year term after agreeing, at Kegerise's request, to include the following provision at Section 8.03:

> RESIGNATION. In the event that Superintendent seeks to resign or separate her employment with Board for any reason other than death, illness, or disability, Superintendent shall give at least sixty (60) days' written notice . . . . No notice whatsoever shall be required by the Superintendent should her resignation be caused by the Board's breach of this AGREEMENT or caused by constructive termination by the Board or any of its members.

Joint Stipulations of Fact ("J.S.F.") Ex. A § 8.03, May 2, 2014 (Contract for Employment of District Superintendent).[3] Kegerise has alleged that this new resignation clause was necessary to protect her interests in light of several Board members' inappropriate behavior. *See* Brief for Kegerise at 6. Kegerise further alleged that, this clause notwithstanding, and in an effort to force her resignation, several Board members persisted in hostile actions including*, inter alia*, physical intimidation and verbal abuse, even after the contract was executed. *Id.* at 6-7.

On March 25, 2014, Kegerise informed the Board that she was receiving medical care and would be unable to return to work until April 21, 2014. While Kegerise was on medical leave, the Board received several letters from Kegerise's counsel asserting that

---

[2]     In their official capacities, the individual members of the Board of Directors of Susquehanna Township School District appeal the Commonwealth Court's decision. We refer to these parties hereinafter, collectively, as the "Board."

[3]     Legal counsel assisted Kegerise in negotiating her new contract. Fed. Compl. ¶ 40, Apr. 17, 2014, *Kegerise v. Susquehanna Twp. Sch. Dist.*, Civ. No. 1:14-CV-00747 (M.D. Pa. 2015) (hereinafter "Fed. Compl.").

Kegerise had been constructively discharged. By letter dated April 16, 2014, the Board responded as follows:

> Dr. Kegerise is and remains the Superintendent of Schools at Susquehanna Township School District pursuant to the contract between she and the Board. Her recent absence from work was based on a physician's note received from Dr. Kegerise. Her time away from the District since that day has been recorded as sick leave derived from Dr. Kegerise's pre-existing sick leave accumulation.
>
> * * * *
>
> Finally, the District understands that Dr. Kegerise's current physician's note indicates that she is precluded from working until April 21, 2014. If she is cleared to return to work, then the District hopes and expects her to return to her duties as Superintendent. If she is not, the District will continue to debit her sick leave time and continue to process her workers['] compensation claim.

J.S.F. at Ex. B.

The next day, April 17, 2014, Kegerise filed a complaint in the United States District Court, alleging, *inter alia*, that the Board had constructively discharged her.[4] Kegerise asserted that, "although no formal termination has taken place, [she] cannot perform the job duties of Superintendent," due to the Board's behavior toward her. Fed. Compl. ¶ 86.[5] Kegerise sought damages in excess of six million dollars, including, *inter alia*, compensatory and economic damages "for loss of contractual salary and other emoluments of employment" and consequential damages for "damage to professional reputation and loss of future salary as an educational administrator." *Id.* at 20.

---

[4] In her federal complaint, Kegerise asserted a "constructive termination" claim. For purposes of consistency, we refer to the claim as "constructive discharge" throughout this opinion.

[5] The federal court dismissed Kegerise's constructive discharge claim, citing a failure to allege conduct that rose to the level of intolerable working conditions. Jan. 7, 2015 Mem. at 18-22, *Kegerise v. Susquehanna Twp. Sch. Dist.*, Civ. No. 1:14-CV-00747 (M.D. Pa. 2015).

Kegerise also signed a verification of her federal complaint, affirming under penalty of perjury that the statements contained within the complaint were true. *See* Verification to Fed. Compl.

On April 21, 2014, Kegerise's physician sent a letter to the Board, advising that Kegerise would be "off of work until further notice due to work related medical issues." Pl.'s Oct. 16, 2014 Evid. Hr'g Ex. 9b. That same day, during a regularly-scheduled meeting, the Board amended its agenda to address Kegerise's federal suit, and passed a motion to "[a]ccept the resignation of Dr. Kegerise as superintendent that is implicit with the term 'constructive discharge,['] effective April 17, 2014." J.S.F. Ex. E, at 130. In a letter dated April 22, 2014, the Board advised Kegerise that, in light of her federal complaint alleging constructive discharge, a majority of the Board had voted to accept her resignation. *Id.* at Ex. F.

On May 16, 2014, Kegerise filed the operative Amended Complaint in mandamus with the Court of Common Pleas of Dauphin County (hereinafter, the "trial court"), seeking reinstatement and compensation. In response, the Board alleged that Kegerise failed to state a claim upon which relief in mandamus could be granted. The Board argued that Kegerise was estopped from asserting that she did not resign, inasmuch as she had submitted a signed verification with her federal constructive discharge claim, affirming that the statements in her complaint were true and correct to the best of her knowledge, information, and belief. *See* Verification to Fed. Compl. The Board maintained that, because resignation is a requirement of a constructive discharge claim, Kegerise's resignation was manifest.

On October 16, 2014, the trial court held an evidentiary hearing to determine whether Kegerise had intended to resign when she filed her federal complaint. At the hearing, the Board demonstrated that Kegerise's counsel had negotiated the resignation

provision in Section 8.03 of Kegerise's employment contract, which used the term "constructive termination." Kegerise Notes of Testimony ("N.T."), 10/16/2014, at 80-81. Kegerise testified that she understood "constructive termination" to occur when the Board's actions made her working conditions so intolerable that she would be forced to resign. *Id.* at 81-84. Kegerise further testified that her understanding of the term "constructive termination," as used in both her employment contract and her federal complaint, was the same. *Id.* at 89.

On November 5, 2014, the trial court issued an order directing the Board to reinstate Kegerise and restore all back pay and benefits, finding, *inter alia*, that Kegerise had never resigned. The Board appealed to the Commonwealth Court.

Before the Commonwealth Court, the Board again argued that mandamus was inappropriate because Kegerise had failed to establish a clear legal right to reinstatement and a corresponding duty in the Board to reverse its acceptance of her resignation. Kegerise asserted that her right to reinstatement arose from the Board's failure to adhere to the removal procedure set forth in Section 1080 of Pennsylvania's Public School Code. That provision states, in relevant part:

> District superintendents and assistant district superintendents may be removed from office and have their contracts terminated, after hearing, by a majority vote of the board of school directors of the district, for neglect of duty, incompetency, intemperance, or immorality, of which hearing notice of at least one week has been sent by mail to the accused, as well as to each member of the board of school directors.

24 P.S. § 10-1080(a).

The Commonwealth Court affirmed the trial court's grant of mandamus. *Kegerise v. Delgrande*, 147 A.3d 930 (Pa. Cmwlth. 2016). The Commonwealth Court characterized the requirements of a constructive discharge claim as follows:

> On its face, the constructive discharge standard contemplates termination *without a plaintiff's actual resignation*, as long as a reasonable person

would have felt compelled to resign, *even if the plaintiff did not actually resign*. The test is whether a hypothetical, reasonable employee would have resigned, not the employee alleging constructive discharge.

*Id*. at 934-35 (Pa. Cmwlth. 2016) (emphasis added). Without confronting precedent requiring actual resignation to sustain a constructive discharge claim,[6] the Commonwealth Court opined that constructive discharge does not require such resignation, and found "unpersuasive" the Board's view that Kegerise's filing of a federal complaint alleging constructive discharge constituted such a resignation. *Id*. at 935.

Turning to the elements of a mandamus claim, the Commonwealth Court determined that, because the Public School Code imposed statutorily-mandated duties upon Kegerise as a superintendent elected by the Board, Kegerise had a clear legal right to perform those duties. *Id*. at 938 (citing 24 P.S. § 10-1081, which sets forth the duties of superintendents). The Court further opined that the Board had a corresponding duty to reinstate and compensate Kegerise unless and until the Board followed the required procedure to remove her. *Id*.

While it acknowledged that the Public School Code does not expressly state that a school board must provide notice and a hearing prior to accepting a superintendent's resignation, the Commonwealth Court nevertheless posited that the General Assembly intended Section 1080 to function as the exclusive mechanism by which superintendents may be removed. *Id*. at 940 n. 11. Even if Kegerise had resigned, the court concluded, the Board's failure to follow the removal procedure in accepting her resignation established her clear legal right to reinstatement for mandamus purposes. *Id*. at 939.

---

[6] *See infra* text accompanying notes 9-10.

Senior Judge Dante Pellegrini authored a dissenting opinion. Judge Pellegrini first observed that both the United States Supreme Court and other federal courts have held that a claim for constructive discharge depends upon the employee's actual resignation.[7] *Id.* at 942-43 (Pellegrini, J., dissenting). Judge Pellegrini opined that "no reasonable person could find that [Kegerise] did not effectively resign," pointing to the fact that Kegerise had exercised her unilateral right to resign without notice to the Board, pursuant to Section 8.03 of her contract with the Board. *Id.* at 943-44. Judge Pellegrini further maintained that, because nothing in the Public School Code limits the method by which a superintendent may resign, Kegerise's legal rights related to resignation existed solely by virtue of her employment contract. *Id.* at 944. Therefore, even if Kegerise had not resigned, mandamus would not lie because the underlying issue was contractual in nature. *Id.* (citing *Kaelin v. Univ. of Pitt.*, 218 A.2d 798, 801 (Pa. 1966) ("[T]he use of mandamus is limited to the enforcement of rights and duties imposed by law, and, if the right or duty rests wholly on contract, the writ will not issue to enforce it.")).

The Board filed a Petition for Allowance of Appeal, which we granted in order to consider whether the Commonwealth Court erred in concluding that the removal procedure set forth in Section 1080 of the Public School Code applies in these circumstances, such that Kegerise had a clear legal right to reinstatement.[8]

---

[7] *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004) ("A constructive discharge involves both an employee's decision to leave and precipitating conduct . . . ."); *see McCarthy v. Darman*, 372 Fed.Appx. 346, 349 (3d Cir. 2010) (finding that an employee's constructive discharge claim failed because it involved a suspension, not an actual resignation); *McWilliams v. W. Pa. Hosp.*, 717 F.Supp. 351, 355-56 (W.D. Pa. 1989) (finding that "there must be at least some relation between the occurrence of the discriminatory conduct and the employee's resignation").

[8] In particular, the Board raised the following issues on appeal for our resolution:

(continued…)

Before addressing the merits of Kegerise's request for mandamus relief, we clarify the requirements of a constructive discharge claim. The Commonwealth Court's account notwithstanding, actual resignation always has been a necessary element of a constructive discharge claim.[9] Indeed, Kegerise herself agrees. *See* Brief for Kegerise at 28 ("[T]he cases cited by [the Board] certainly hold that resignation is one of the necessary elements of constructive discharge. Indeed, they insist on it."). This Court first adopted the doctrine in 1964, stating that, "[a] constructive discharge occurs only

---

(…continued)

1. Whether the Commonwealth Court majority's holding that a claim of constructive discharge does not require actual resignation conflicts with the United States Supreme Court's holdings in *Green v. Brennan*, 136 S.Ct. 1769 (2016) and *Pennsylvania State Police v. Suders*, 124 S.Ct. 2342 (2004)?

2. Whether the Commonwealth Court majority's holding that a claim of constructive discharge does not require actual resignation conflicts with this Court's decision in *Pennsylvania Labor Relations Bd. v. Sand's Rest. Corp.*, 240 A.2d 801 (Pa. 1968) or the Superior Court's decisions in *Kroen v. Bedway Sec. Agency, Inc.*, 633 A.2d 628 (Pa. Super. 1993) and its progeny?

3. Whether the Commonwealth Court majority erred as a matter of law and so abused its discretion as to call for this Court's review in concluding that Kegerise had a clear right to relief in mandamus pursuant to Section 1080 of the Public School Code, even though Section 1080 is silent as to the [Board's] obligations in the face of a superintendent's resignation?

Brief for the Board at 4.

[9]     In the early twentieth century, the National Labor Relations Board ("NLRB") developed the doctrine of constructive discharge to protect employees who resigned after their employers retaliated against them for engaging in, or refusing to engage in, collective bargaining activities. *See* Roslyn Corenzwit Lieb, *Constructive Discharge under Section 8(a)(3) of the National Labor Relations Act: A Study in Undue Concern over Motives*, 7 INDUS. REL. L.J. 143, 145-55 (1985). Professor Lieb notes that the NLRB first applied the concept of constructive discharge in 1936, and began using the term as early as 1938. *Id.* at 146-47 (citing *Canvas Glove Mfg. Works, Inc.*, 1 N.L.R.B. 519 (1936); and *Sterling Corset Co.*, 9 N.L.R.B. 858 (1938)).

where the employer makes working conditions so intolerable that the employee is *forced to resign.*" *PLRB v. Sand's Rest. Corp.*, 240 A.2d 801, 803-04 (citing *NLRB v. Saxe-Glassman Shoe Corp.*, 201 F.2d 238 (1st Cir. 1953); and *NLRB v. Chi. Apparatus Co.*, 116 F.2d 753 (7th Cir. 1940)) (emphasis added).

Although this Court has not had occasion to review the constructive discharge standard since our opinion in *Sand's*, the Supreme Court of the United States recently reaffirmed the actual resignation requirement in the context of its review of a Title VII action:

> A claim of constructive discharge . . . has two basic elements. A plaintiff must prove first that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign. *But he must also show that he actually resigned.* In other words, an employee cannot bring a constructive-discharge claim until he is constructively discharged. Only after both elements are satisfied can he file suit to obtain relief.

*Green v. Brennan*, ___ U.S. ___, ___, 136 S.Ct. 1769, 1777 (2016) (internal citations omitted) (emphasis added); *see Pa. State Police v. Suders*, 542 U.S. 129 (2004).[10] We

_____

[10] The *Suders* Court distinguished an action for constructive discharge from a hostile work environment claim, emphasizing that an employee alleging constructive discharge must have actually resigned:

> A . . . constructive discharge claim entails something more [than allegations of an abusive working environment]: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign. *See, e.g.*, *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1160 (8th Cir. 1999) ("[A]lthough there may be evidence from which a jury could find sexual harassment, ... the facts alleged [for constructive discharge must be] ... so intolerable that a reasonable person would be forced to quit."); *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").

*Suders*, 542 U.S. at 147.

see no reason to depart from this time-honored requirement. In order to maintain a claim of constructive discharge, an employee first must demonstrate that he or she actually resigned.

Turning to the mandamus question, our standard of review is limited to determining whether the trial court abused its discretion, committed an error of law, or whether sufficient evidence exists to support its findings.[11] Our scope of review of a trial court's grant of mandamus is *de novo* and plenary. *Crozer Chester Med. Ctr. v. Dep't of Labor and Indus., Bureau of Workers' Comp.*, 22 A.3d 189, 194 (Pa. 2011).

The standard by which a grant of mandamus relief must be evaluated is well-settled:

> Mandamus is an extraordinary writ that will only lie to compel official performance of a ministerial act or mandatory duty where there is a clear legal right in the plaintiff, a corresponding duty in the defendant, and want of any other appropriate or adequate remedy. It may be used to compel performance of a ministerial duty, or to compel action in a matter involving judgment or discretion. However, it may not be used to direct the exercise of judgment or discretion in a particular way, or to direct the retraction or reversal of an action already taken.

*Chanceford Aviation Props., L.L.P. v. Chanceford Twp. Bd. of Supervisors*, 923 A.2d 1099, 1107-08 (Pa. 2007) (citation omitted). The petitioner's right to performance of a mandatory duty must be well-defined, clear, and specific; where any doubt exists, mandamus relief will not lie. *Equitable Gas Co. v. City of Pitt.*, 488 A.2d 270, 272-73 (Pa. 1985).

To address whether mandamus lies in the instant case, we first must determine whether the Board was required to follow the procedure set forth in Section 1080 of the

---

[11]    *See, e.g., Bell Atl. Mobile Sys., Inc. v. Borough of Clifton Heights*, 661 A.2d 909, 911 n.5 (Pa. Cmwlth. 1995), *appeal denied*, 676 A.2d 1194 (Pa. 1996).

Public School Code. As our inquiry requires interpretation of the Public School Code, our standard of review is *de novo* and the scope of our review is plenary. *Discovery Charter Sch. v. Sch. Dist. of Phila.*, 166 A.3d 304, 316 (Pa. 2017) (citing *Johnson v. Lansdale Borough*, 146 A.3d 696, 709 (Pa. 2016)). As with all questions of statutory interpretation, we must ascertain and effectuate the intent of the General Assembly, giving effect to all of the statute's provisions if possible. 1 Pa.C.S. § 1921(a). When the words of the statute clearly and unambiguously set forth the legislative intent, we need not look beyond those words to ascertain the statute's meaning. *See id.*, § 1921(b); *Trust Under Agreement of Taylor*, 164 A.3d 1147, 1155 (Pa. 2017).

To prevent what it perceived as the Board's attempt to circumvent the removal procedure, the Commonwealth Court held that school boards must apply the Section 1080 removal procedure even when accepting a superintendent's resignation. *Kegerise*, 147 A.3d at 939. When interpreting the meaning of a statute, we must not "add, by interpretation, a requirement not included by the General Assembly." *Commonwealth v. Giulian*, 141 A.3d 1262, 1268 (Pa. 2016). The clear language of Section 1080 limits application of the notice and hearing procedure for removal and termination to situations in which a superintendent has displayed "neglect of duty, incompetency, intemperance, or immorality" (*i.e.*, removal for cause). 24 P.S. § 10-1080.[12] In such cases, the superintendent may be removed for cause only after a

---

[12] Agreeing with Kegerise that Section 1080 "bears relevance to constructive discharge scenarios," Chief Justice Saylor urges that "the statute should still be read as proscribing illegal forced removals." Concurring Op. at 2 n.1. As we note above, the General Assembly specified four instances in which a school board must follow the notice and hearing procedure for removal and termination ("neglect of duty, incompetency, intemperance, or immorality"). 24 P.S. § 10-1080. We must presume that, if the legislature had intended for Section 1080 to encompass scenarios of alleged constructive discharge, such as Kegerise's, it would have done so expressly. *See Atcovitz v. Gulph Mills Tennis Club, Inc.*, 812 A.2d 1218, 1223 (Pa. 2002) ("[U]nder the doctrine of *expressio unius est exclusio alterius*, the inclusion of a specific matter in a (continued…)

hearing, notice of which must be "sent by mail to the accused." *Id.* Section 1080 does not speak of "resignation," nor does it require that the removal procedure apply to circumstances where a school board accepts a superintendent's resignation. We cannot impose a duty upon the Board to provide notice and a hearing to a resigning superintendent absent any language in the statute that directs us to do so. Moreover, we observe that the General Assembly's demonstrative use of "the accused" suggests that Section 1080 hearings are adversarial and are intended to give the superintendent an opportunity to respond to allegations of wrongdoing. Such a process is wholly unnecessary and indeed irrelevant when a superintendent severs her own employment, as in the case of resignation.

While the Commonwealth Court correctly observed that the General Assembly restricted removal of superintendents to the four specific reasons set forth in Section 1080, that court failed to recognize that the General Assembly also granted superintendents the freedom to negotiate their own terms of resignation. *See Kegerise*, 147 A.3d at 936. Section 1073 of the Public School Code requires that a superintendent's contract must "contain the mutual and complete agreement" between the superintendent and the board with respect to terms and conditions of employment.

(…continued)
statute implies the exclusion of other matters."). Although Chief Justice Saylor advocates for a broader interpretation of Section 1080, he nonetheless concludes that, "in light of the substantial public interest at stake," the School Board may view a constructive discharge claim "as embodying a resignation and accept it." Concurring Op. at 2 n.1. As we discuss *infra*, the General Assembly granted superintendents ample latitude to negotiate terms that address resignations, as Kegerise did here. As Chief Justice Saylor notes, superintendents also may avail themselves of legal and equitable remedies through litigation. *See id.* It may well be that, finding those mechanisms adequate to address situations such as those that appear in the case at bar, the General Assembly intended to omit resignations, forced or voluntary, from the scope of Section 1080 altogether.

24 P.S. § 10-1073(e)(2).  The employment contract must specify any termination, severance, and buyout provisions that the parties negotiated.  *See id.* § 10-1073(e)(2)(v).  The parties are free to negotiate the terms by which the superintendent may resign, provided that the resignation provision does not allow for payment of severance.[13]   Hence, the Commonwealth Court's conclusion that Section 1080's

---

[13]   The General Assembly placed only one restriction upon the parties' ability to negotiate severance provisions:

> No agreement between the board of school directors and a district superintendent or assistant district superintendent for a *negotiated severance of employment prior to the end of the specified contract term* shall provide for severance compensation to the district superintendent or assistant district superintendent . . . .

*Id.* § 10-1073(e)(3) (emphasis added).  The  General Assembly's intent to afford superintendents the right to negotiate severance provisions also is evident when Section 1073 is compared to Section 1121 of the Public School Code, which dictates the procedure that professional employees (such as principals and teachers) must follow when they resign:

> Contracts under subsection (b) shall contain only the following:

> * * * *

> "AND IT IS FURTHER AGREED by the parties hereto that none of the provisions of this act may be waived either orally or in writing, and that this contract shall continue in force year after year, with the right of the board of school directors (or board of public education) to increase the compensation over the compensation herein stated, from time to time, as may be provided under the provisions and proper operation of the established salary schedule, if any, for the school district, subject to the provisions of law, without invalidating any other provision of this contract, *unless terminated by the professional employe by written resignation presented sixty (60) days before resignation becomes effective,* or by the board of school directors (or board of public education) by official written notice presented to the professional employe: Provided, That the said notice shall designate the cause for the termination and shall state that an opportunity to be heard shall be granted if the said professional employe, within ten (10) days after receipt of the termination notice, presents a written request for such hearing."

(continued…)

removal procedure, rather than the resignation procedure for which the parties contract, applies when a superintendent resigns is inconsistent with Section 1073.

We presume that the General Assembly intended the entire Public School Code to be effective. We must not construe statutory provisions in a manner in which one section operates to nullify another, unless the statute expressly directs us to do so. 1 Pa.C.S. § 1922(2); *see Trust Under Agreement of Taylor*, 164 A.3d at 1157. We also must presume that the General Assembly did not intend an absurd or unreasonable result. *See* 1 Pa.C.S. § 1922(1).

The Commonwealth Court's interpretation of Section 1080 would nullify Section 1073's provisions concerning negotiation of severance, and would produce unreasonable results. If Section 1080 is the sole means by which a superintendent's employment may be terminated prior to the end of the contractual employment term, as the Commonwealth Court suggests, Subsection 1073(e) is meaningless. It would be an exercise in futility for school districts and superintendents to negotiate severance provisions pursuant to Section 1073(e)(3) if the Section 1080 procedure applies in any event. Under such a scheme, even if faced with an unequivocal letter of resignation, a school board statutorily would be required to indulge the empty formality of sending notice to "the accused" superintendent and to hold a Section 1080 hearing before accepting the resignation—all, presumably, against the will of the resigning superintendent herself. *See* 24 P.S. § 10-1080. Such an absurdity cannot be what the General Assembly intended. The Section 1080 removal procedure is inapplicable where a superintendent resigns.

---

(…continued)
24 P.S. § 11-1121(c) (emphasis added). Unlike superintendents, professional employees may not negotiate their own resignation provision.

For mandamus to lie, Kegerise must demonstrate that she has a "well-defined, clear, and specific" right to reinstatement under Section 1080 by showing that she did not resign from her position, but rather that she was removed for cause. *Equitable Gas Co.*, 488 A.2d at 272. In support of her assertion that she was removed, Kegerise stresses that she did not provide notice to the board that she intended to sever her employment (*i.e.*, by proffering a letter of resignation), and that she did not specifically plead that she had resigned in her federal complaint. Brief for Kegerise at 20-21. Kegerise also contends that the Board knew that she did not intend to resign, and that it held the meeting to accept her putative resignation in order to "foreclose any opportunity for her to clarify her intentions." *Id.* at 13.

With the assistance of legal counsel, Kegerise exercised her power under Section 1073 to negotiate for the inclusion of a resignation provision in her employment contract. By her own design, that provision gave Kegerise the express contractual right to resign from her position *without notice* if her resignation was "caused by constructive termination by the Board or any of its members." J.S.F. Ex. A § 8.03. Kegerise's failure to submit a letter of resignation to the Board cannot be considered evidence of removal where she negotiated in advance specifically to free herself of the duty to provide notice in the event of her resignation.[14]

It is significant as well that Kegerise instructed her legal counsel (the same attorney who negotiated her resignation provision) to send letters to the Board claiming that it had constructively discharged her. One day after the Board informed her that she

---

[14] Furthermore, to the extent that Kegerise's rights arise from her employment contract, she would not have an action in mandamus. *See Kaelin*, 218 A.2d at 801 (holding that the use of mandamus is "limited to the enforcement of rights and duties imposed by law," and, "if the right or duty rests wholly on contract, the writ will not issue to enforce it.").

was still employed, Kegerise filed a verified federal complaint alleging constructive termination, a necessary element of which is actual resignation. Kegerise testified under oath that she understood "constructive termination" to involve a forced resignation. Moreover, Kegerise sought damages for the loss of her salary and future salary, which necessarily would imply that Kegerise considered her employment terminated before the meeting at which the Board voted to accept her resignation—prior to which the Board's position remained that Kegerise was still employed.

Upon review of the uncontested facts in the record, we find that the trial court erred in concluding that Kegerise was entitled to mandamus relief. *See Bell Atl. Mobile Sys., Inc.*, 661 A.2d at 911 n.5. Kegerise has failed to demonstrate a clear legal right to reinstatement pursuant to Section 1080.

Accordingly, the order of the Commonwealth Court reinstating Kegerise as superintendent with back pay and benefits is reversed.

Justices Baer, Todd, Donohue, Dougherty and Mundy join the opinion.

Chief Justice Saylor files a concurring opinion.